# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KRYSTAL L. GOINS,          )
                                        )

           Plaintiff,        )

      v.                             )      Case No. 12 C 4057

                                            )

CAROLYN W. COLVIN,[1] Commissioner  )      Magistrate Judge Jeffrey Cole
of Social Security,               )

                                           )

          Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Krystal Lynn Goins ("Ms. Goins"), seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI, Section 1614(a)(3)(A) of the Act. Ms. Goins asks the court to reverse the Commissioner's decision and award benefits, or remand the decision for further proceedings. The Commissioner, in turn, seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

On November 28, 2008, Ms. Goins applied for SSI benefits, claiming that she became disabled on November 1, 2007, due to lower back pain. (Administrative Record ("R.") 204-206). On January 15, 2009, the Commissioner denied her application. (R. 93-98). On February 9, 2009, Ms. Goins filed a request for reconsideration. (R. 98-99). On April 22, 2009, Ms. Goins' request was denied. (R. 104-108).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

On May 29, 2009, Ms. Goins requested an evidentiary hearing before an administrative law judge (R. 108-109). On October 4, 2010, administrative law judge Roxanne Kelsey ("ALJ") held an evidentiary hearing. (R. 36-80). At the hearing, attorney Edward Grossman represented Ms. Goins. (R. 36-80). Ms. Goins and vocational expert Julie Bose ("Ms. Bose") testified at the hearing. (R. 36-80).

On October 25, 2010, the ALJ found Ms. Goins to not be disabled and denied the claim. (R. 18-35). On December 2, 2010, Ms. Goins filed for a review of the hearing decision with the Social Security Administration's Appeals Council. (R. 15-17). On April 9, 2012, the Appeals Council denied the request for review. (R. 1-6). Thus, the ALJ's October 25, 2010 decision stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.955; 404.981.

Ms. Goins appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Ms. Goins was born on April 7, 1981, making her twenty-nine years old at the time of the ALJ's decision. (R. 204). She lives in her father's house with her boyfriend in Lansing, Illinois. (R. 205, 59). She is 5'6'' tall and weighs 220 pounds. (R. 249). Ms. Goins has a high school education and is able to speak, write, and understand English. (R. 249). She also completed a cooking and hospitality program in 2007 and received her associate's degree. (R. 41-42). She worked as a retail sales clerk, as a pharmacy technician, as a telemarketer, and as a caterer at the Loyola University Medical Center Human Resources. (R. 44-45). Ms. Goins explained that the catering position required her to stand on her feet for eleven or twelve hours each day and to constantly carry food

that was fifty pounds or heavier. (R. 42-43). She added that she stopped working there because she could not stand for that long and because her doctor advised her not to go back. (R. 43). She has not worked since 2008. (R. 44).

## B.
## The Medical Evidence

On October 13, 1998, Ms. Goins underwent a magnetic resonance imaging ("MRI") of her lumbar spine at Oak lawn MR & Imaging Center. (R. 315). The MRI revealed a small, right paracentral disc protrusion at L5-S1. (R. 315).

On November 3, 2007, Ms. Goins went to the emergency room at Oak Forest Hospital of Cook County (R. 316-321) where she complained of headache and low back pain. (R. 316-321). The report showed that Ms. Goins had a headache for four days and low back pain for a few days with a history of herniated disc. (R. 318). She was discharged that day and prescribed Vicodin. (R. 318).

## 1.
## Treating source

On September 4 2008, Ms. Goins visited her primary physician, Dr. Suneela Harsoor (Dr. Harsoor"), M.D. (R. 326). Again, she complained of significant lower back pain. (R. 326). Specifically, she stated that the pain is "burning and shooting in nature" and was constant. (R. 326). She described the pain as a 5 to 10 out of 10. She added that the pain is partially relieved by resting, but aggravated by any movement, change in position, standing, sitting, or walking. (R. 326).

Dr. Harsoor then completed a report conforming Ms. Goins' pain, but noting that on examination, Ms. Goins is able to walk with a slow guarded gait, is able to balance well on tiptoes and heels. Her lungs had clear breath sounds. There was mild paraspinal muscle tenderness and stiffness. There was no sacroiliac tenderness. There was a well-healed scar from liposuction in the abdomen. There were no other signs of inflammation. Her range of motion of the lumbar spine was

normal. Her straight leg raise test was positive on the left at 60 degrees and on the right at 50 degrees. Her Patrick's test was negative. An examination of the lower extremities and sensation was normal. Her muscle strength was 5/5. Her tendon reflexes were 2+. Her pulses were normal. (R. 326-327).

The report also confirmed the MRI of the lumbar spine that Ms. Goins underwent in October 1998. (R. 327). It also noted that Ms. Goins is currently taking Vicodin, which she received in November 2007 at the emergency room. (R. 326).

Dr. Harsoor made a diagnosis of lumbar disk herniation, lumbar radiculopathy, and myofascial pain. (R. 327). He then recommended conservative treatment and prescribed Lyrica and noted that the efficacy of epidural steroid injections will depend on Ms. Goins' response to the medication. (R. 327).

On that same day, September 4, 2008, Dr. Harsoor completed a nerve and hyper conduction study of Ms. Goins. (R. 339). The nerve conduction revealed impaired conduction of right L5 peroneal nerve +5 very severe, bilateral S1 sural nerve +3 marked and right S2 post femoral cutaneous nerve +1 mild. (R. 339). Her hyper conduction testing showed bilateral L1 upper lumbar nerve -1 hyper and left L4 saphenous nerve -1 hyper. (R. 339).

On November 13, 2008, two months later, Ms. Goins returned to Dr. Harsoor's office and received a refill on Lyrica. (R. 345). During that visit, Dr. Harsoor encouraged home exercises. (R. 345). On September 11, 2009, claimant had an epidural steroid injection in the lumbar spine. (R. 348). On December 1, 2008 Dr. Harsoor submitted a letter stating that Ms. Goins is under his care for lower back and is unable to work due to lumbar disc protrusion. (R. 354).

## 2.
## Non-treating sources

On January 14, 2009, at the request of the Illinois Disability Determination Services ("DDS"), Dr. Reynaldo Gotanco ("Dr. Gotanco"), a State agency medical consultant, reviewed Ms. Goins' medical record and performed a physical residual functional capacity ("RFC") assessment. (R. 355-362). He found that Ms. Goins could occasionally lift fifty pounds and frequently lift twenty-five pounds. (R. 356). He also found that Ms. Goins could stand and/or walk (with normal breaks) for about six hours in an eight hour workday, and sit (with normal breaks) for about six hours in an eight hour workday. (R. 356).

On April 20, 2009, Dr. Virgilo Pilapil ("Dr. Pilapil"), M.D., another state agency medical consultant, reviewed Ms. Goins' medical history. (R. 362). Dr. Pilapil then affirmed Dr. Gotanco's RFC determination. (R. 365). He questioned the severity of Ms. Goins' allegations. (R. 365). Specifically, he noted that Ms. Goins reported worsening problems as of January 1, 2009 in that she cannot sit or stand for long and that she uses her cane more often. (R. 365). However, Dr. Pilapil noted that despite this claimed worsening condition, Ms. Goins continued to have no new medical evidence or treatment for it. (R. 365). Therefore, Dr. Pilapil found that Dr. Gotanco's opinion to be consistent with his own findings. (R. 365).

## 3.
## Other hospital visits

On February 3, 2010 Ms. Goins went to John H. Stroger Hospital. (R. 367-373). Her extremity examination showed no edema. (R. 367). She had tenderness in the thoracic spine with negative straight leg rising bilaterally. (R. 367). She had positive signs of leg weakness. (R. 367). She had 4/5 strength in the left lower extremity. (R. 367). She was referred to neurosurgery and physical therapy. (R. 369.) Her diagnosis at discharge was lumbar back pain. (R. 368)

On March 10, 2010, Ms. Goins presented at John H. Stroger Hospital for a second time. (R. 375). There, she underwent MRIs of her lumbar and cervical spines. (R. 375-379). The MRI of her cervical spine revealed mild multilevel degenerative disc disease and degenerative facet arthropathy, and a Chiari I malformation. (R. 376). MRI studies of the lumbar spine showed multilevel degenerative disc disease and degenerative facet arthropathy. (R. 378). There was L4-L5 circumferential disc bulge with posterocentral disc protrusion and partial posterior annular fissure effacing central thecal sac and abuts bilateral proximal L5 transversing nerve roots. (R. 378). The measurement of the central spinal canal reflected stenosis. (R. 378). There was L5-S1 diffuse posterior disc bulge with large posterocentral disc protrusions partially effacing ventral thecal sac and abuts bilateral proximal S1 transversing nerve root sleeves. (R. 378). The measurements of central spinal canal reflect stenosis. (R. 378).

### C.
### The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

On October 4, 2010, ALJ Roxanne Kelsey convened a hearing, at which Ms. Goins, represented by counsel, appeared and testified. At the hearing, the ALJ inquired first about Ms. Goins' education and work experience. Ms. Goins testified that she graduated high school and completed a cooking and hospitality program and received an associate's degree. (R. 41-42). When asked why she was not working in that field, she stated that it was because of the long hours standing. (R. 42). Specifically, she stated that her last position was at a catering department at Loyola University Medical Center Human Resources. (R. 44-45). She explained that the catering position required her to stand on her feet for eleven or twelve hours each day, and to constantly carry

food that were fifty pounds or heavier. (R. 42-43). She added that she stopped working there because she could not stand for that long and because her doctor advised her not to return to that job. (R. 43).

When asked if she worked after she became disabled in November 2007, Ms. Goins said "no." (R. 43). She stated that she became disabled around the time she worked at Loyola. Therefore, she added that if she worked at Loyola in 2008, she became disabled in November 2008. (R. 43).

She testified that she worked at Loyola from July 2008 to November 2008. (R. 44). When asked if she worked there on a full-time basis, she answered "no." (R. 44). She stated that at Loyola, although "everybody has to start part-time…her hours were definitely full-time." (R. 44).

Ms. Goins also testified about her previous positions as a retail sales clerk, as a pharmacy technician, and as a telemarketer. (R. 45). She testified that the retail sales clerk position, which she worked from 2003 to 2007, was seasonal. (R. 46.). When asked whether she knew what to do in that position, how to handle the questions, or how to direct people, Ms. Goins answered in the affirmative. (R. 46). But she stated "that was before I hurt myself definitely." (R. 46).

Regarding Ms. Goins' pharmacy technician position, she testified that she probably worked there for a year. (R. 46). She testified that she was not interested in pursuing that path as a career, and that she was not certified. (R. 46). Regarding her position as a telemarketer, she testified that she probably held that position for six months. (R. 47). When asked whether she sat down when she was doing that job, Ms. Goins said "yes." (R. 47). Ms. Goins stated she quit because she wanted to go to school. (R. 47).

Next, the ALJ inquired about Ms. Goins' impairments. Ms. Goins testified that she suffered from pain in her neck and lower back. (R. 48). The pain shot down to her foot on the left and right side. (R. 48). She also experienced numbness in her face and in her right arm from the shoulder to the elbow. (R. 48). She also had migraine headaches and panic attacks. (R. 48). When asked whether

she had seen a doctor for her migraines and panic attacks, Ms. Goins said "yes." (R. 48). At that time, however, the ALJ noted that there were no records of treatment for the headaches and panic attacks. (R. 49). However, Ms. Goins conceded that she was given Xanax for her panic attack when she reported to the emergency room, and was told to follow up with her primary care doctor. (R. 51). She also stated that she was taking medications for anxiety attacks. (R. 52).

When asked why she could not do the catering job, Ms. Goins testified that it was because of the pain of standing for so long and lifting heavy objects. (R. 53). When asked whether she had been prescribed physical therapy or surgery, she stated that she was on the waiting list for discectomy for both her neck and back. (R. 53).

Ms. Goins testified that she is 5'6'' and weighs about 250 pounds. (R. 56). When asked whether any doctor had told her to exercise, or walk, she responded that she has diabetes. (R. 56). She testified that before she became disabled, she was very active and that her weight was under control. (R. 56). She testified that she cannot go on walks or swim. (R. 56). For example, she stated that she went swimming at her local gym once with her friend, and experienced muscle spasms and cramping in her legs. (R. 57).

When asked whether she can sit long enough to watch a movie, she said "no." (R. 58). She stated that she is constantly trying to either lie down or adjust herself just to get comfortable. (R. 58). She testified that when watching a half-hour show she can kind of follow it depending on the time she takes her medicine and how drowsy she is. (R. 61). She said that she tries not to take her medicine so that she does not feel lightheaded. (R. 61).

When asked how far she can walk and whether she can walk around the grocery store, Ms. Goins testified that she cannot walk far. (R. 58). She stated that the farthest she can walk is to her

car parked in front of her house and five houses down. (R. 72). She also stated that she cannot bend and pick up something off the ground, because it hurts. (R. 72).

She further testified that she only walks at home with her cane, which she uses a lot at home. (R. 58). She testified that if she had to go to the grocery store, she would use the motorized carts. (R. 58). She testified that she had been told to take her cane outside with her, but it is a little embarrassing. (R. 58).

Ms. Goins testified that although she has a driver's license, she does not drive because all of her medicine says not to drive. (R. 59, 68). Her boyfriend or her mother drives her. (R. 59). (R. 59). She does not take public transportation, because she is terrified and "get really nervous going places by myself and being by myself a lot." (R. 69). She testified that she lives with her boyfriend in her house that her father bought her. (R.59). Her boyfriend does the chores. (R. 59). She neither dusts, washes the dishes, loads the dishwasher, or does the laundry. (R. 59). She cannot stand up to cook. (R. 59). When asked how often she leaves her home, she responded that "once every two weeks." (R. 62). She testified that she does not sit on the porch, walk, visit with a neighbor, or walk to the mailbox. (R. 62). When asked whether she belongs to any groups that she attends, counseling, church, a group of friends that she gets together with, she said "not anymore." (R. 62).

When asked if she can lift a gallon of milk to pour herself a glass, she responded that she said she can do that, but added that her wrist goes in and out of socket. (R. 63). The ALJ, however, noted that there was no documentation of the wrists going in and out. (R. 63). She further testified that her upper shoulder is dead to the touch. (R. 63). She testified that she can use her hands to button her jacket. (R. 64). But she cannot tie her shoes, because of the bending to reach the shoe. (R.64). for example, she stated that she would tie her shoes before putting them on, and have her boyfriend put them on. (R. 64).

Ms. Goins testified about her memory. (R. 64). She said that although she does not have a total memory loss, she has problems remembering things. (R. 65). For example, she does not remember to take her medicine. (R. 65). But she does remember to go to her doctor's appointments. (R. 65).

Ms. Goins testified that her facial numbness is very uncomfortable and affects her concentration. (R. 66). For example, she stated that when watching her cooking show, she cannot pay attention unless she is on medication. (R. 67). She also testified that she has headaches about four or five times a week. (R. 70). Also, Ms. Goins testified that her shoulder to the elbow is dead to the touch. (R. 70). She stated that that condition has persisted since 2008. (R. 70). She also testified that she experienced side effects from the medications she takes every day. (R. 70-71). For example, she gets dizzy, drowsy, and lightheaded, and gets nauseous a lot. (R. 71).

**2.**
**The Vocational Expert's Testimony**

Ms. Bose testified as a vocational expert ("VE") at the hearing. (R. 73-78). Ms. Goins did not object to Ms. Bose's qualifications as a VE. (R. 73). Ms. Bose testified about Ms. Goins' work experience. (R. 74). She stated that her position as a catering helper, as performed and recognized in the Dictionary of Occupation Titles ("DOT"), is medium and low end of semiskilled, offering no real advantage over an unskilled worker. (R. 74). Moreover, Ms. Bose testified that her retail sales clerk position, which is light and semiskilled, is also the low end of semiskilled, offering no real advantage over an unskilled worker. (R. 74). A pharmacy technician, light and semiskilled; and a telemarketer, sedentary, semiskilled and the semiskill being persuasive skills. (R. 75).

In response to the ALJ's first hypothetical, Ms. Bose testified that an individual who can lift and carry fifty pounds occasionally and twenty-five pounds frequently, can stand and walk for six hours in an eight hour work day, can push and pull as much as can lift and carry; can sit for six hours

in an eight hour workday, cannot climb ropes, ladders or scaffolds; can occasionally balance, kneel, crawl, climb ramps and stairs, stoop and crouch, and can have occasional exposure to dust, fumes, odors and other respiratory irritants, would be able to perform all past relevant work with the exception of the catering helper, which would be ruled out to the only occasional exposure to dust, fumes and pulmonary irritants. (R. 76).

Further, Ms. Bose testified that given Ms. Goins' age, education and past work, there are other jobs that Ms. Goins could perform (R. 76). The first would be a laundry worker. (R. 76). There were 2,653 such jobs in the region. (R. 76). The second would be a store laborer. (R. 76). There were 3700 positions in the region. (R. 76). The third job would be a greeter. (R. 76). There were 538 such positions in the region. (R. 76).

Ms. Goins' attorney then asked Ms. Bose to clarify the greeter position on actually what they do. (R. 77). Ms. Bose responded that greeters are people for example who work the Cellular One, AT&T. (R. 77). They are the people who greet you when you come in the door and ask you what your problem is so they can direct you. (R. 77). Ms. Goins' attorney also asked Ms. Bose whether a person's inability to concentrate for better than 15% of the work time would affect those jobs she mentioned: the laundry worker, store laborer, and store greeter. (R. 77-78). Ms. Bose responded that all of the positions that she cited were positions that do not have strict productions quotas, but if the person was indeed off task more than 15% of the workday, it would rule out these positions and work altogether. (R. 78).

**D.**
**The ALJ's Decision**

On October 25, 2010, the ALJ issued her decision and found that Ms. Goins "is not disabled" under section 1614(a)(3)(A) of the Social Security Act. (R. 31). In evaluating Ms. Goins' claim, the ALJ followed the familiar five-step sequential process in determining whether Ms. Goins was disabled. In step one, the ALJ found that Ms. Goins had not engaged in substantial gainful activity since November 28, 2008, the application date. (R. 23). In step two, the ALJ found that Ms. Goins had the following severe impairments: disc protrusion at L5-S1 with myofascial pain, cervical degenerative disc disease, a history of pneumonia and bronchitis, and obesity. (R. 23).

In addition to these impairments, the ALJ also noted that Ms. Goins also complained of anxiety, panic attacks, headaches, and depressive mood from her physical health. (R. 23). However, the ALJ concluded that the medical evidence did not support these claims. (R. 23). For example, the ALJ noted that there had not been any diagnosis of depression or anxiety disorder in the record. (R. 23). Ms. Goins indicated that she received Xanax for a panic attack, but no supporting medical records were in the record. (R. 23). The ALJ found that there was no medically determinable mental impairment or diagnosis of migraines. (R. 23). Lastly, the ALJ noted that the record did not support her allegations of not going out or dislike of being around people. (R. 23).

In Step three, the ALJ considered the available medical evidence for each of Ms. Goins' severe impairments and concluded that Ms. Goins did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (R. 24).

In regards to Ms. Goins' RFC, the ALJ made the following determination:

The claimant can lift or carry 50 pounds occasionally and 25 pounds frequently. She can push or pull as much as she can lift or carry. The claimant can stand or walk six hours in an eight hour workday. The claimant can sit for 6 hours in an eight hour workday. The claimant can never climb ropes, ladders or scaffolds. She can occasionally balance kneel, crawl,

crouch or stoop. She can occasionally climb ramps or stairs. She can have occasional exposure to dust, fumes, odors, and other respiratory irritants.

(R. 25). In forming Ms. Goins' RFC, the ALJ gave little weight to Dr. Harsoor's opinions because they were unsupported by other record evidence. (R. 29). However, the ALJ gave "significant" weight to Dr. Gotanco and Dr. Pilapil's opinions, because they provided detailed diagnostic testing and physical examination findings to support their opinion of Ms. Goins. (R. 29).

In step four, the ALJ determined that Ms. Goins had no past relevant work. (R. 29). In making this determination, the ALJ considered the vocational expert's testimony that Ms. Goins had no significant past relevant work. (R. 30). However, at step five, the ALJ found that, based on Ms. Goins' age, education, work experience, and residual functional capacity, there were other jobs that exist in significant numbers in the national economy that Ms. Goins can perform. (R. 30). Accordingly, the ALJ concluded that Ms. Goins "had not been under a disability." (R. 31).

### III.
### DISCUSSION

### A.
### The Standard of Review

A district court reviewing an ALJ's decision must affirm it if the decision is supported by substantial evidence. 42 U.S.C. § 405(g). The court reviews the ALJ's decision directly, but does so with deference, *Weatherbee v. Astrue,* 649 F.3d 565, 568–569 (7th Cir.2011), and with a limited role of not making independent credibility determinations or reconsidering the facts and evidence. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000); *Simila v. Astrue,* 573 F.3d 503, 513–514; *Elder,* 529 F.3d at 413. The court does "not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan,* 988 F.2d 789, 792 (7th Cir.1993). Substantial evidence is "more than a

mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the court finds that the ALJ's decision is supported by substantial evidence, then the court must affirm the decision, even if reasonable minds may differ as to whether the plaintiff is disabled. 42 U.S.C. § 405(g); *Books v. Chater,* 91 F.3d 972, 978 (7th Cir.1996). However, since conclusions of law are not entitled to such deference, if the Commissioner committed an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir.2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.2002). Although the ALJ need not address every piece of evidence, the ALJ cannot subjectively limit his discussion to only the evidence that which supports his ultimate conclusion. *Herron,* 19 F.3d at 333. The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir.2009). The Seventh Circuit refers to this process as building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet,* 78 F.3d at 307. It is a "lax" standard. *Berger,* 516 F.3d at 545. It is enough if the ALJ " 'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of disability.' " *Berger,* 516 F.3d at 545; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001).

## B.
## The Five–Step Sequential Analysis

To qualify for disability benefits, a claimant must be "disabled," which is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. §423(d)(1)(A); *Stanley v. Astrue,* 410 Fed. Appx. 974, 976 (7th Cir. 2011); *Liskowitz v. Astrue,* 559 F.3d 736, 739–740 (7th Cir. 2009).

Determining whether a claimant is disabled requires a five-step process: (1) Is the plaintiff currently unemployed; (2) Does the plaintiff have a severe impairment;( 3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;( 4) Is the plaintiff unable to perform his past relevant work; and( 5) Is the plaintiff unable to perform any other work in the national economy? 20 C.F.R. §§ 404.1520; *Simila,* 573 F.3d at 512–513; *Briscoe ex rel. Taylor,* 425 F.3d at 351–352. The plaintiff has the burden of establishing a disability at step one through four. In the first four steps, Ms. Goins has the burden of proving her disability and RFC. If she meets this burden, the burden of production then shifts to the commissioner to prove that Ms. Goins retains the RFC to perform other works in the national and regional economy. *Zurawski v. Halter*, 245 F. 3d 881, 885-86 (7th Cir. 2001). Here, the bulk of Ms. Goins' arguments focuses on steps three and four. Therefore, the court need not address steps one, two, and five.

## C.
### Analysis

On appeal, Ms. Goins raises several arguments. Ms. Goins claims that the ALJ erred by: (1) improperly concluded that her impairments, alone or in combination, do not meet or equal any of the listings under 20 C.F.R. Part 404, Subpart P. Appendix 1; (2) improperly weighing medical opinion; (3) failing to discuss Ms. Goins' obesity in making the credibility or RFC determination; (4) failing to consider her severe pain; (5) improperly considering her lack of medical treatment; (6) improperly considering her part-time work; (7) failing to discuss the observations of a Social Security Administration employee who interviewed her; and (8) committing errors using "boilerplate" language. (P's Mot. 7-17).

**1.**

**The ALJ properly determined that Ms. Goins' impairment or combination of impairments did not meet or equal Listing 1.04 (A) or (C)**

The ALJ found that Ms. Goins did not have an impairment or combination of impairments qualifying her for disability under 20 C.F.R. Part 404, Subpart P. Appendix 1.04 (Listing 1.04). Ms. Goins argues that this finding is incorrect because the new evidence, the MRI from 2010—which the state agency doctors had failed to review, showed that she satisfied at least three of the requirements of Listing 1.04. (P's Mot. 9). Ms. Goins also argues that the ALJ erred by failing to consider her combination of impairments in determining whether she was disabled. (P's Mot. 9). Specifically, she contends that her obesity, disc generation throughout the cervical spine and Chiari malformation could have been equal in severity to a listed impairment. (P's Mot. 10).

To satisfy a listing, a claimant must show that his or her impairment or combination of impairments meet all elements of such a listing. *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002)(citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)). A claimant need not precisely meet the criteria of the listing to be found disabled; rather, if his or her impairment or combination of impairments medically equals the element(s) in the listing, disability is presumed and benefits are awarded. *See* 20 C.F.R. § 404.1520(d); *Bowen v. Yukert*, 482 U.S. 137, 141-42 (1987).

Listing 1.04 relates to *disorders of the spine*, and there are three subsections of Listing 1.04: (A), (B), and (C), only one of which needs to be satisfied for a claimant to meet the listing requirements. Ms. Goins argues that she meets Listing 1.04(A) or 1.04(C). (P's Mot. 9-10). Therefore, we will not discuss subsection (B) here.

Listing 1.04(A) requires evidence of nerve root compression characterized by, for example, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and if a lower back disorder, positive straight-leg raising test. 20 C.F.R. Pt. 404, Subpt. P. App. 1.04(A). Listing

1.04(C) requires evidence of lumbar spinal stenosis characterized by, for example, chronic nonradicular pain and weakness and inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P. App. 1.04(C).

The ALJ adequately articulated her step three analysis. In considering Listing 1.04 (A) and (C), the ALJ stated that "the evidence does not support nerve root compression characterized by neuroanatomic distribution of pain, limitations of motion of the spine, motor loss accompanied by sensory or reflex loss and if there is involvement of the lower back, positive straight leg raising test." (R. 24). She noted that Ms. Goins' physical examination showed muscle strength of 5/5; Ms. Goins' range of motion testing of the lumbar spine was normal. ((R. 24). Her examination of the lower extremities and sensation was grossly normal. (R. 24).

Moreover, the ALJ noted that Ms. Goins can ambulate effectively without an assistive device. (R. 24). She noted although Ms. Goins said that she uses a cane, there is no medial record of this assistive device. (R. 24). Also, the ALJ noted that because Ms. Goins said that she does not use the cane because of claimed embarrassment, the use of the cane would not appear to be necessary. (R. 24). Because the limited medical examinations and physical findings did not support and corroborate these claimed symptoms, the ALJ found that the claimant did not meet Listing 1.04 (a) or (c).

Contrary to Ms. Goins' arguments, the ALJ sufficiently considered Ms. Goins' impairments, including obesity in her disability determination. In fact, the ALJ considered Ms. Goins obesity. The ALJ noted that "obesity may have an adverse impact upon a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, I have considered any additional and cumulative effects of obesity." (R. 24). The ALJ noted that Ms. Goins is 66 inches

tall and weighs 220 pounds, and is therefore obese. (R. 24). Thus, the ALJ considered Ms. Goins' obesity. *Arnett v. Astrue,* 676 F.3d 586, 593 (7th Cir. 2012) ("an ALJ must factor;1328;1328 in obesity in determining the aggregate impact of an applicant's impairments.")

In the alternative, Ms. Goins contends that because the State agency doctors' RFC assessment was based on the 1998 MRI and not the 2010 MRI, the ALJ was required to have contacted Dr. Harsoor for clarification in order to properly determine whether she met or medically equaled any listing. (P's Mot. 7-10). To support her arguments, Ms. Goins cites to several cases, but none of them requires an ALJ in all circumstances to obtain an updated medical evaluation merely because new information has been added to the administrative record since the previous evaluation.

Contrary to Ms. Goins' arguments, the ALJ did discuss the 2010 MRI. (R. 27). The ALJ stated that "MRI studies of her cervical spine in March 2010 revealed mild multilevel degenerative disc disease and degenerative facet arthropathy. MRI studies of the lumbar spine showed multilevel degenerative disc disease and degenerative facet arthropathy." (R. 27). In *Sims v. Barnhart*, 309 F. 3d 424, 429 (2002), the court found that an ALJ's failure to address specific findings did not render the decision unsupported by substantial evidence because an ALJ need not address every piece of evidence in his or her decision. *Sims*, 309 F. 3d at 429.

Moreover, the ALJ was not required to obtain additional medical evidence. One of the cases Ms. Goins cited is *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). (P's Mot. 9). In *Barnett*, the court reversed the ALJ's decision because he only provided a two-sentence discussion of a listing, and never considered the treating physician's opinion regarding listing equivalence. He simply assumed the absence of equivalency without any relevant discussion. *Barnett*, 381 F. 3d at

670-71. Here, the ALJ did provide a detailed discussion of Listings 1.04 (A) and 1.04(C) (see discussion above). Thus, the ALJ was not required to obtain additional medical evidence.

**2.**
**The ALJ's RFC Assessment was proper**

A residual functional capacity (RFC) is an assessment of what work-related activities the plaintiff can perform despite his or her limitations. *Dixon,* 270 F.3d at 1178; *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir.2004). In reviewing the ALJ's decision, a court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute his own judgment for that of the ALJ. *Young,* 362 F.3d at 1001; *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir.2003); *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir.2003). Rather, the court's task is to determine whether the ALJ's factual findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Jens,* 347 F.3d at 212; *Stevenson v. Chater,* 105 F.3d 1151, 1153 (7th Cir.1997). The RFC assessment must include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96–8p.

Ms. Goins argues that the ALJ improperly evaluated her RFC. Specifically, she claims that the ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (P's Mot. 12). But she claims that the ALJ did not discuss these symptoms in the RFC. (P's Mot. 12).

The ALJ determined that Ms. Goins was capable of standing and walking for most of the workday, and could lift and carry fifty pounds for one third of an 8-hour workday. (R. 25). The ALJ supported her factual findings with substantial evidence in the record. For example, the ALJ noted that one year after Ms. Goins' alleged onset date of disability, she was working at Loyola on a part-time basis. (R. 28). She worked there for three months for eleven or twelve hours each days. (R. 28).

That position required Ms. Goins to lift more than fifty pounds. (R. 28). Furthermore, the ALJ noted that she says she does not do any household cleanings or drive, but she indicated in her function reports that she drove depending on where she had to go. (R. 28). The ALJ also noted that Ms. Goins' treating physician encouraged a home exercise program. (R. 28).

In addition, the ALJ relied on the Physical Functional Capacity Assessment in the record. Dr. Gotanco completed that assessment, in which he found that Ms. Goins can lift fifty pounds occasionally and twenty-five pounds frequently. (355-362). Dr. Pilapil confirmed Dr. Gotanco's findings. (R. 362).

Thus, because the ALJ pointed to evidence in the record to substantiate her conclusion that Ms. Goins is capable of meeting those physical requirements, the ALJ's RFC determination was proper.

## A.
### The ALJ was not required to give controlling weight to the opinions of Dr. Harsoor, Ms. Goins' treating physician.

Ms. Goins contends that the ALJ improperly weighed medical opinions. Specifically, she argues that the ALJ improperly gave little weight to the opinion of her treating physician, Dr. Harsoor. For the reasons discussed below, the ALJ did not err in the weight assigned to the medical opinions in the case.

An ALJ may accord greater weight to opinions from treating physicians, because they may be the sources who can best provide a "detailed, longitudinal picture" of the claimant's medical condition. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, the ALJ need give controlling weight to a treating source's opinion only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. *Id.; see also White v. Barnhart,* 415 F.3d

654, 658 (7th Cir. 2005). The ALJ is free to discount the opinion of the treating physician so long as she provides good reasons for doing so. 20 C.F.R. § 404.1527(d)(2); *Clifford*, 227 F. 3d at 870; *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also ;3441;3441"bend ove;3443;3443r backwards" to assist a patient in obtaining benefits ... [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted); *Stephens v. Heckler,* 766 F. 2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

The ALJ properly explained the reasons for not according controlling weight to Dr. Harsoor's opinions. The ALJ stated that Dr. Harsoor only indicated that Ms. Goins was unable to work due to lumbar disc protrusion. (R. 354). But, as the ALJ noted, Dr. Harsoor did not "specify any functional limitations, and he did not "give any timeframe for the claimant's inability to work." (R. 29). Moreover, Dr. Harsoor "saw the claimant only a few times prior to making this extreme opinion," (R. 29) and the weight to be accorded a treating doctor's opinion is, in part, a function of how often he saw the patient. Additionally, Dr. Harsoor's opinion was internally inconsistent with the evidence in the record. The ALJ noted that the claimant was actually working up until a month prior to Dr Harsoor's opinion, and according to her testimony was working very long hours and carrying heavy objects. (R. 29). Thus, because Dr. Harsoor's opinion was inconsistent with the record and not well-supported by the objective medical evidence, the ALJ acted appropriately in not giving this opinion controlling weight. *See Henke v. Astrue,* 498 F. App'x 636, 640 (7th Cir. 2012);

*Knight v. Charter,* 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").

Instead of according controlling weight to Ms. Goins' treating physician, the ALJ gave significant weight to the opinions of two state agency reviewers: Dr. Gotanco and Dr. Pilapil. (R. 29). When evidence comes in the form of a medical opinion from a state agency physician, the ALJ "must explain the weight given to the opinions in their decisions." 20 C.F.R. § 404.1527(f); *McKinzey v. Astrue*, 641 F. 3d 884 (7th Cir. 2011). Here, the ALJ adequately articulated his reasons for giving significant weight to Dr. Gotanco and Dr. Pilapil's opinions. For example, the ALJ pointed to Exhibit 7F, which contains Dr. Gotanco's opinion that Dr. Harsoor's opinion is not supported by any physical findings in his progress report. (R. 29). The ALJ stated that Dr. Gotanco provided detailed diagnostic testing and physical examination findings to support his opinion. (R. 29). Moreover, Dr. Piliapil affirmed Dr. Gotanco's findings, noting that although Ms. Goins reported worsening problems in her condition, she did not have any new medical evidence or treatment for the worsening condition. (R. 29). *See Eichstadt v. Astrue*, 534, F. 2d 663, 668 (7th Cir. 2008) (noting that the claimant bears the burden of producing medical evidence that supports his disability claim).

Thus, because the ALJ properly explained her reasons for discounting Dr. Harsoor's opinions and for giving controlling weight to the state agency doctors' opinions, this Court finds that the ALJ's assignment of weight to medical opinions was correct.

### B.
### The ALJ's credibility determination was also proper

Next, Ms. Goins contends that the ALJ improperly assessed her credibility. (P's Mot. 11-17). She contends that the ALJ: (1) did not discuss her obesity; (2) did not consider her severe pain; (3) improperly considered her lack of medical treatment; (4) considered her part-time work; (5) did not

discuss the observations of a Social Security Administration employee who interviewed her; and (6) committed errors using "boilerplate" language. (P's Mot. 11-17).

An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Castille v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). An ALJ is entitled to look to the record, or lack thereof, in determining an individual's credibility. *Sienkiewicz,* 409 F.3d at 804; *Powers v. Apfel,* 207 F.3d 431, 435–36 (7th Cir. 2000). To determine credibility of a plaintiff's alleged symptoms, an ALJ muss assess several factors, such as the plaintiff's daily activities and the effectiveness of any medication.[2]

Here, the ALJ found that Ms. Goins' medially determinable impairments "could reasonably be expected to cause the alleged symptoms," but that her complaints regarding the "intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 27). In reaching this conclusion, the ALJ considered various factors, including the "objective medical evidence, medical treatment, medications taken, activities of daily living, work history and credibility factors." (R. 27). This court agrees, as discussed below, with the ALJ's credibility determination.

## 1.
## The ALJ explicitly discussed Ms. Goins' obesity in making the credibility determination

Ms. Goins argues that "while the ALJ acknowledged at step two that obesity was a severe impairment, [she] did not discuss this impairment in making the credibility or RFC determinations." (P's Mot. 16). She also argues that the state agency doctors, Dr. Gotanco and Dr. Pilapil, did not

---

[2] Other important factors include: the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. S.S.R. 96-7p.

mention Ms. Goins' obesity in their assessment. (P's Mot. 10). Therefore, she continues, The ALJ's decision is flawed. (P's Mot. 10).

An ALJ should consider the effects of obesity together with existing impairments. SSR 02-1p. However, a failure to consider the effects of obesity may be harmless error. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004). In *Skarbek*, the court stated that although the ALJ did not explicitly consider the claimant's obesity, it was harmless error since the ALJ considered the limitations noted by the reviewing doctors, who were aware of the claimant's obesity. *Skarbek*, 390 F.3d at 504. Therefore, the claimant's obesity was factored indirectly into the ALJ's decision as part of the doctors' opinions. *Id.*

Here, unlike the ALJ in *Skarbek*, the ALJ explicitly discussed Ms. Goins' obesity on two occasions (R. 24, 28). First, in determining whether Ms. Goins' impairment meets a listing, the ALJ stated that "I have considered any additional and cumulative effects of obesity." (R. 24). She referred to Social Security Ruling 02-1p and recognized that  ruling requires that obesity be considered and that obesity may have an adverse impact upon co-existing impairments. (R. 24). Moreover, the ALJ mentioned that Ms. Goins is "66 inches tall and weighs 220 pounds. She is considered obese." (R. 24). The ALJ also mentioned that Ms. Goins can "ambulate effectively." (R. 24). She therefore concluded that "there is no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing-level severity." (R. 24).

Second, in determining Ms. Goins' RFC, the ALJ specifically stated that "I considered the claimant's pain resulting from her impairments and obesity and reduced her RFC to work with a medium exertional level." ( R. 28). The ALJ continued, "I considered her obesity and her use of

inhaler with history of bronchitis…." (R. 28). Therefore, it is clear from the record that the ALJ did in fact discuss and consider Ms. Goins' obesity along with her other impairments.

**2.**
**The ALJ properly discussed Ms. Goins' subjective allegations**

Ms. Goins contends that the ALJ erred by finding that her severe pain, headaches, side effects, and memory problems were not credible. (P's Mot. 14-15). She claims the ALJ failed to mention the diagnosis of Chiari malformation, and degenerative disk disease in her cervical spine. (P's Mot. 15). She argues that since these diagnoses support her allegations of severe headaches, the ALJ's entire analysis is flawed. The ALJ properly considered and discussed Ms. Goins complaints of headaches, memory problems, and side effects (R. 25, 26, 28).

For example, the ALJ noted that Ms. Goins said she suffers from great pain. (R. 25). The ALJ noted that Ms. Goins alleged that she takes Diclofenac and Lyrica for inflammation, Ibuprofn and Vicodin for pain, and Skelexin as a muscle relaxer. (R. 25). The ALJ noted that Ms. Goins said that these medications cause tiredness, dizziness, and numbness. (R. 25). Moreover, the ALJ noted that Ms. Goins alleged that because of the pain, she has trouble sleeping at night, standing, or sitting long. (R. 25, 26). She also said that her wrists go in and out, and that she cannot band, crouch or kneel. (R. 26). However, the ALJ found that Ms. Goins' complaints not fully credible because of her limited and conservative treatment, as well as the other record evidence (R. 29).

In regards to Ms. Goins' allegations of pain, the ALJ noted that Ms. Goins testified that she completed a cooking and hospitality program in 2007. (R. 26) She testified that she was not working in that field because of the eleven or twelve hours standing and the lifting of more than fifty pounds. (R. 26). However, the ALJ found that Ms. Goins' alleged severe pain from sitting and standing not credible because she worked in that field at Loyola cafeteria from July to November 2008—a year after she alleged she became disabled.(R. 26).

The ALJ also noted that Ms. Goins said she has a cane she can use but does not bring it outside due to embarrassment." (R. 26). However, the ALJ noted that the record does not reflect that use of the cane was prescribed by any medical source. (R. 24). Also, the ALJ noted that because Ms. Goins said she does not use the cane because of claimed embarrassment, the use of the cane would not appear to be necessary. (R. 24).

The ALJ also accounted for Ms. Goins' alleged memory problems and headaches. The ALJ noted that Ms. Goins  watches cooking shows and can concentrate on the program, but it depends on the day and her medications taken(R. 26). The ALJ also noted that Ms. Goins said she could remember her doctor's appointments, but she needs reminders to take her medications. (R. 26). However, the ALJ found that these complaints are not consistently contained in the medical record and there is little or no treatment for these complaints." (R. 28). *See Eichstadt*, 534 F. 2d at 668 (noting that the claimant bears the burden of producing medical evidence that supports his disability claim).

For the above reasons, substantial evidence supports the ALJ's assessment of Ms. Goins' subjective allegations. *See Sims*, 442 F. 3d at 538 ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying. Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported…can the finding be reversed.")

In addition, while it is true that the ALJ did not specifically mention Chiari malformation, she was not required to recite each of Ms. Goins' diagnoses. *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) ("an ALJ's 'adequate discussion' of the issues need not contain a 'complete written evaluation of every piece of evidence."); *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir.

2007) ("[T]he existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling [i.e., severe,] impairments.")

### 3.
### The ALJ properly considered Ms. Goins' lack of medical treatment

Failures to seek medical treatment in the face of claimed illness, can be a factor in evaluating credibility. *See Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005). An ALJ also must consider "any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96–7p. An ALJ has a duty to consider factors such as inability to travel, mental illness, or economic constraints that may have prevented the claimant from seeking medical care. *See McClesky v. Astrue,* 606 F.3d 351, 352 (7th Cir. 2010); *Godbey v. Apfel,* 238 F.3d 803, 809 (7th Cir. 2000).

Ms. Goins argues that the ALJ incorrectly relied on her lack of treatment to find her allegations not credible. (P's Mot. 13). She argues that emergency treatments are very expensive, (P's Mot. 13), and that the ALJ did not ask her if cost was a reason for her not in seeking emergency treatment for her pain. (P's Mot. 13).

The ALJ considered Ms. Goins' course of medical treatment and found that her conservative treatment, lack of consistent treatment, and gaps in treatment detracted from her credibility (R. 27-28). Ms. Goins asserts that she had no medical insurance and could not afford treatment. (P's Mot. 13-14). Furthermore she claims that she did not seek emergency room treatment because it was expensive. (P's Mot. 14). Here, although the ALJ did not question Ms. Goins about financial hardship during the oral hearing, there is no evidence of financial hardship in the record. Moreover, the record reflects that she went to the emergency room on at least two occasions (R. 26-28, 318-20, 331). Thus, she knew how to access free treatment available at Stroger Hospital.

**The ALJ properly considered Ms. Goins' part-time work
in making the credibility determination**

Finally, Ms. Goins complains that the ALJ erred in considering her part-time work in evaluating her credibility. (P's Mot. 14). Specifically, she stated that the ALJ did not discuss her testimony giving the reasons she was incapable of performing that work at Loyola. She testified that she left the job after a few months because she could not stand and carry objects, and because her doctor advised her not to return back. (R. 43).

The ALJ stated that "[a]lthough the claimant has not worked at a level of [substantial gainful activity], I find it very probative of her physical condition that she worked after the onset date of disability for eleven or twelve hour days and lifted more than fifty pounds. She performed this work from July through November 2008 albeit on a part time basis." (R. 28). The ALJ stated that this was a year after Ms. Goins' alleged onset date of disability. The ALJ stated that this work activity is consistent with her limited medical treatment and inconsistent with her extreme allegations of severe pain and limited mobility. (R. 28). This was a reasonable conclusion and the ALJ's determination that Ms. Goins perform medium exertional level work for four months while she claimed to be disabled and thus this undermined her credibility was not patently wrong.

**5.
The ALJ was not required to consider the observations of the social security
employee in making her credibility determination**

Ms. Goins also complains that the ALJ did not discuss the observations of the social security administration employee who interviewed her in making her credibility determination. (R. 16). She contends that the employee observed that she had a difficult time sitting in the chair during the interview. (P's Mot. 16). However, contrary to Ms. Goins' argument, Dr. Gotanco expressly noted

the employee's observation of Ms. Goins. (R. 362). But he still found that Ms. Goins could perform the full range of medium exertional work. (R. 362).

Moreover, while SSR 96-7p requires the ALJ to "consider any observations recorded by SSA personnel who previously interviewed the individual.. .", it does not require an explicit discussion of such evidence. *See* SSR 96-7p. Thus, the fact that Dr. Gotanco mentioned such an observation in the RFC and the fact that the ALJ gave significant weight to Gotanco's findings, is evident that the ALJ considered it.

### 6.
### The ALJ's boilerplate language did not make the credibility determination invalid

Ms. Goins objects to the "boilerplate" language used by the ALJ concerning the intensity, persistence and limiting effects of symptoms being not credible to the extent they are inconsistent with the residual functional capacity assessment. The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly, but to no avail, criticized this template as "unhelpful." *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir.2012), "opaque," *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012), and "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010); *Martinez v. Astrue,* 630 F.3d 693, 694 (7th Cir.2011).

The court has explained that this formula backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility."*Bjornson,* 671 F.3d at 645–46. Similarly, merely saying that a plaintiff's statements are not generally credible fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue,* 628 F.3d 346 (7th Cir.2010); *Parker,* 597 F.3d 920.

While these sorts of boilerplate statements are inadequate, *by themselves,* to support a credibility finding, *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir.2012), their use does not make a credibility determination invalid. *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v.*

*Astrue,* 688 F.3d 306, 311–12 (7th Cir.2012). Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011); *Parker,* 597 F.3d at 921–22.

Here, the ALJ provided a detailed analysis. For example, the ALJ considered the objective medical evidence, treatment history, state agency physician opinions, Dr. Harsoor's opinion, Plaintiff's part-time work history, and Plaintiff's daily activities in finding that Ms. Goins subjective allegations were not fully credible (R. 25-29).

## CONCLUSION

For the reasons stated above, Ms. Goins motion for reversal and remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/11/13